UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOSEPH JAMES PAGAN,

                    Petitioner,                    Case No. 1:18-cv-1103

v.                                                 Honorable Paul L. Maloney

TONY TRIERWEILER,

                    Respondent.

_____/

**<u>REPORT AND RECOMMENDATION</u>**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Joseph James Pagan is incarcerated with the Michigan Department of Corrections at the Bellamy Creek Correctional Facility (IBC) in Ionia County, Michigan. Following a four-day jury trial in the Macomb County Circuit Court, Petitioner was convicted of first-degree criminal sexual conduct (CSC-I), in violation of Mich. Comp. Laws § 750.520b, and first-degree murder, in violation of Mich. Comp. Laws § 750.316. On December 22, 2014, the court sentenced Petitioner to concurrent terms of life imprisonment without parole, for first-degree murder, and eighteen years, nine months to forty years, for CSC-I.

On September 17, 2018, Petitioner filed his habeas corpus petition raising five grounds for relief, as follows:

  I.   Mr. Pagan was denied his federal and state rights to due process of law because (A) the prosecution's evidence admitted at trial did not establish the charged offenses and (B) the prosecution failed to admit legally sufficient evidence to prove each element of

criminal sexual conduct in the first degree beyond a reasonable doubt.

II.    The trial court abused its discretion in denying Mr. Pagan's request for a jury instruction on voluntary manslaughter when the evidence included his unrebutted claims in a recorded statement to police that he acted only in response to complainant's threat to kill him, put him in a headlock, then picked up a nearby gumball machine and struck him with it.

III.    Mr. Pagan is entitled to a *Lockridge* remand because (A) the mandatory sentencing guidelines have been declared unconstitutional and (B) the trial judge was operating under a mistake of law and/or inaccurate sentencing information at sentencing, that the statutory sentencing guidelines scheme was constitutional and binding.

IV.    Defendant was denied a fair trial by the introduction of numerous gruesome, highly inflammatory, irrelevant autopsy photographs which cause[d] a juror to pass out during their presentation, and defendant counsel's failure to object denied him effective assistance of counsel.

V.    Defense counsel failed to present an affirmative defense of insanity/mental illness at the time the crime was committed w[h]ere there was pre-trial evidence presented that Mr. Pagan suffered from an extensive history of paranoid schizophrenia with positive symptoms and delusional disorder, thereby violating his due process right to effective assistance of counsel.

(Pet., ECF No. 1, PageID.5-12.)  Respondent has filed an answer to the petition (ECF No. 6) stating that the Court should decline to review issues I and III under the concurrent sentencing doctrine, several claims are not cognizable, at least one claim is unexhausted, and all of the claims are meritless.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds, with the exception of

Ground III, are meritless or not cognizable.  With regard to Ground III, which relates only to Petitioner's sentence on the CSC-I conviction, I recommend that the Court decline to consider Petitioner's challenge under the concurrent sentencing doctrine. Accordingly, I recommend that the petition be denied.

**Discussion**

## I.      Factual allegations

The facts underlying Petitioner's convictions are gruesome.  Following apparently consensual sexual intercourse with the victim, Petitioner and the victim fought.  He beat her, strangled her, duct-taped her mouth, duct-taped a garbage bag over her head, retrieved a pellet gun from his vehicle and shot her several times, poured bleach on her, and left.  She was not found for several days.  The autopsy revealed that the victim died of asphyxiation.

The jury heard testimony from the victim's ex-husband, the policeman who discovered the victim's body while conducting a welfare check, the medical examiner who performed the autopsy, the police officers who gathered evidence from the crime scene, and the detectives who investigated, arrested, and interviewed Petitioner.  The jurors also viewed a police interview of Petitioner recorded shortly after his arrest. The jurors deliberated for about two hours before returning their verdicts.

Petitioner directly appealed his convictions and sentences.  In his initial brief, filed with the assistance of counsel, he raised three issues—the issues he raises here as habeas issues I, II, and III.  (Pet'r's Appeal Br., ECF No. 7-12, PageID.1029-1030.)

3

Petitioner filed a *pro per* supplemental brief raising two additional issues—the issues

he raises here as habeas issues IV and V. (Pet'r's Supp. Appeal Br., ECF No. 7-13,

PageID.1133.)

Petitioner sought a remand to build a record in the lower court regarding his

trial counsel's ineffective assistance. Petitioner's ineffective assistance claim was

centered on whether he was competent at the time the victim was killed, at the time

he waived his *Miranda* rights, and at the time he was preparing for and participating

in his trial. Because competence for the *Miranda* waiver had not been considered by

the mental health professional who examined Petitioner before trial, Petitioner was

scheduled for additional examination. (Hr'g Tr., ECF No. 7-9.) When the report from

that examination did not favor Petitioner's position, he requested—and was

granted—an additional examination by an independent professional. (Hr'g Tr., ECF

No. 7-10.) The independent report also contradicted Petitioner's claim, so the claim

was abandoned. (Hr'g Tr., ECF No. 7-11, PageID.890-892.) That left only Petitioner's

claim that counsel was ineffective for arguing to the jury that the evidence would

show manslaughter only to have the court refuse to give the manslaughter

instruction. (*Id.*, PageID.892-893.) The trial court denied relief on that issue. (*Id.*,

PageID.893.)

By unpublished opinion issued May 23, 2017, the Michigan Court of Appeals

rejected Petitioner's claims and affirmed the trial court. (Mich. Ct. App. Op., ECF

No. 7-12, PageID.896-900.) Petitioner then filed a *pro per* application for leave to

appeal in the Michigan Supreme Court raising the same five issues he raised in the court of appeals.  (Pet'r's Appl. for Leave to Appeal, ECF No. 7-15, PageID.1226-1232.)  By order entered March 5, 2018, the Michigan Supreme Court denied leave to appeal.  (Mich. Order, ECF No. 7-15, PageID.1224.)   Petitioner did not file a petition for certiorari in the United States Supreme Court.  (Pet. ECF No. 1, PageID.3.)  Instead, he timely filed his habeas petition in this Court.

## II.   AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000);

*Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad

discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## III. Sufficiency of the evidence

Petitioner contends the evidence of CSC-I fell short in several ways. First, Petitioner argues there was no evidence of penetration by the pellet rifle, as charged in the information. Second, although a pellet Petitioner fired from a rifle struck the victim in the labia majora, he contends that the pellet did not "penetrate" the genital opening. Third, Petitioner contends the evidence was not sufficient to show that the victim was alive when the pellet entered her labia majora. If the victim was already dead, Petitioner argues, there can be no CSC-I conviction.

### A.    Living victim

Petitioner did not raise his third sufficiency challenge in the Michigan courts. He raises it for the first time in his habeas petition.  Before the Court may grant habeas relief, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275-77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  The district court can and must raise the exhaustion issue *sua sponte* when it clearly appears that habeas claims have not been presented to the state courts.  *See Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987); *Allen v. Perini*, 424 F.2d 134, 138-39 (6th Cir. 1970).

Petitioner bears the burden of showing exhaustion.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  Petitioner has not raised this claim in any state court.

An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c).  Petitioner has at least one available procedure by which to raise

8

the issue he has presented for the first time in this application.  He may file a motion for relief from judgment under Mich. Ct. R. 6.500 *et seq.*

Under Michigan law, one such motion may be filed after August 1, 1995.  Mich. Ct. R. 6.502(G)(1).  Petitioner has not yet filed his one allotted motion.  Therefore, the Court concludes that he has at least one available state remedy.  To properly exhaust his claim, Petitioner would have to file a motion for relief from judgment in the Macomb County Circuit Court.  If his motion was denied by the circuit court, Petitioner would have to appeal that decision to the Michigan Court of Appeals and the Michigan Supreme Court.  *O'Sullivan,* 526 U.S. at 845; *Hafley,* 902 F.2d at 483 ("'[P]etitioner cannot be deemed to have exhausted his state court remedies as required by 28 U.S.C. § 2254(b) and (c) as to any issue, unless he has presented that issue both to the Michigan Court of Appeals and to the Michigan Supreme Court.'") (citation omitted).

Although the Court may not grant relief on a habeas claim that is unexhausted, the Court may deny relief on such a claim.  28 U.S.C. 2254(b)(2).  Petitioner's unexhausted claim is so lacking in merit that dismissal, even absent exhaustion, is appropriate.

A Section 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

9

the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

To prevail on his claim, Petitioner must show that, viewing the evidence in a light that favors the prosecution, there was not sufficient evidence to permit the jurors to conclude beyond a reasonable doubt that the victim was alive when Petitioner fired the pellet into her labia majora. Petitioner cannot make that showing. First, the detective who interviewed Petitioner testified that Petitioner went out to get the pellet rifle because he knew his efforts to asphyxiate her had not succeeded—that she was still alive. (Trial Tr. III, ECF No. 7-5, PageID.706.) Second, the medical examiner testified that the blood evidence established that the victim was alive when she suffered the pellet wound to her labia majora. (*Id.*, PageID.574-

575.)  Indeed, although the jurors could have simply disbelieved those witnesses, there was no evidence supporting Petitioner's claim that the victim was dead when he shot her.  Viewing the evidence in a light that favors the prosecution, however, there was sufficient evidence to permit the jury to conclude, beyond a reasonable doubt, that the victim was alive when Petitioner shot her.  Accordingly, his habeas challenge with regard to this issue is entirely meritless.

### B.    Penetration of the genital opening

The Michigan Court of Appeals directly addressed Petitioner's other two sufficiency challenges.  That makes it even more difficult for Petitioner to prevail. Where the state court has determined the sufficiency claim, both the *Jackson* standard and AEDPA apply.  For that reason, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

11

The Michigan Court of Appeals rejected Petitioner's other two sufficiency arguments:

> Defendant's first argument is that there was insufficient evidence of penetration for the jury to be able to find beyond a reasonable doubt that he committed CSC-I, and the felony information failed to provide him with adequate notice of the nature of the CSC-I charge. After beating the victim, strangling her, and duct-taping garbage bags over her head, defendant retrieved an air rifle from his vehicle and shot the victim several times. One of those shots he directed "at" her vagina; at the time, he was standing over her and she was lying naked on the floor. Defendant accurately points out that the information and the instruction given to the jury indicated that defendant accomplished the penetration with the rifle; however, the evidence shows that defendant never brought the rifle itself into any kind of direct physical contact with the victim's genitalia. Rather, the pellet penetrated the victim's left labia majora. Although perhaps a horrific fact pattern, we find the information and evidence sufficient.
>
> When CSC-I is charged pursuant to MCL 750.520b(1)(f), the prosecution must prove three elements: (1) the defendant caused personal injury to the victim; (2) the defendant engaged in sexual penetration with the victim; and (3) the sexual penetration was accomplished by use of force or coercion. *People v Nickens*, 470 Mich 622, 629; 685 NW2d 657 (2004). "Sexual penetration" is defined, in relevant part, as including "any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body." MCL 750.520a(r). Relatively few cases have directly addressed whether the labia comes within the scope of "sexual penetration." However, those cases have uniformly held that the Legislature intentionally specified and distinguished "genital opening" from "vagina," and the labia majora is part of the "genital opening." *People v Bristol*, 115 Mich App 236, 237-238; 320 NW2d 229 (1981); *People v Whitfield*, 425 Mich 116, 135 n 20; 388 NW2d 206 (1986); *People v Legg*, 197 Mich App 131, 132-134; 494 NW2d 797 (1992); *People v Lockett*, 295 Mich App 165, 188; 814 NW2d 295 (2012). We will not read into the statute any requirements not stated. We therefore find that the pellet intruded into the victim's genital opening.

Furthermore, we will not infer a requirement into the statute that defendant maintain physical contact with the penetrating object where he was unambiguously the proximate and immediate cause of that penetration.  For the same reason, we do not find the information or the jury instruction insufficient.  We think that they could have been more clear; however, there can be no doubt that defendant used the air rifle to effectuate the penetration.  The pellet, for all practical purposes, was part of the rifle as a total instrumentality.   We do not think the information and instruction inconsistent with the evidence, and at worst any vagueness in the information was obviated by testimony at the preliminary examination.  Defendant did not object to the information, and any error therein does not rise to plain error affecting his substantial rights.  See *People v Bailey*, 310 Mich App 703, 715-716; 873 NW2d 855 (2015).  A rational trier of fact could have found beyond a reasonable doubt that defendant used the air rifle to penetrate the victim's genital opening.  See *People v Unger*, 278 Mich App 210, 222, 253; 749 NW2d 272 (2008).

(Mich. Ct. App. Op., ECF No. 7-12, PageID.896-897.)

Although Petitioner casts his arguments as "sufficiency of the evidence" claims, he is actually attacking how the State of Michigan defines penetration and genital opening.  It is the prerogative of the state, however, to define the elements of the crime and that definition binds the federal courts.  *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson*, 443 U.S. at 324 n.16 ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.").  Thus, if the State of Michigan declares that the labia majora is part of the

genital opening, that conclusively resolves the issue.  And, if the State of Michigan holds that defendant does not have to be in contact with the penetrating object at the instant of penetration, so long as he is the proximate and immediate cause of the penetration, that issue too is conclusively resolved.  Those are state-law questions.

It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  The decision of the state courts on a state-law issue is binding on a federal court.  *See Johnson*, 559 U.S. at 138; *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized " 'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.' "  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).  *See also Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018) (same).

Therefore, Petitioner has failed to show that the state appellate court's rejection of his remaining sufficiency claims is contrary to, or an unreasonable application of clearly established federal law and he is not entitled to habeas relief.

## IV.  Manslaughter instruction

Petitioner next contends that his trial was rendered unfair by the trial court's refusal to read a jury instruction regarding the voluntary manslaughter.  The court instructed the jury on first-degree premeditated murder—the charged crime—and the lesser included offense of second-degree murder.  But, the court would not go so

14

far as instructing the jury of the even lesser crime of voluntary manslaughter because the court concluded the evidence simply did not support it.

An understanding of Michigan's classification of homicides is helpful when analyzing the jury instructions in Petitioner's case.  In Michigan, murder is an intentional killing.  First-degree murder is a statutory crime.  Section 750.316 of Michigan Compiled Laws identifies three circumstances that would raise an intentional killing to the level of first-degree murder: premeditated killing; felony murder; and the murder of a peace or corrections officer.  All other kinds of murder are second-degree murder.  Mich. Comp. Laws § 750.317.

In Michigan there is another "killing" crime know as manslaughter.  "[U]nder Michigan law, the difference between second-degree murder and [voluntary] manslaughter is that a manslaughter conviction requires the defendant to show, by a preponderance of the evidence, that he killed in the 'heat of passion,' with such passion caused by 'adequate provocation,' without 'a lapse of time during which a reasonable person could control his actions.' " *Ruelas v. Wolfenbarger*, 580 F.3d 403, 410 (6th Cir. 2009) (quoting *People v. Mendoza*, 664 N.W.2d 685, 690 (Mich. 2003)).  Michigan also recognizes another category of manslaughter, characterized as involuntary manslaughter.  "Under Michigan law, a homicide committed with the mens rea of malice is murder. . . . [a] homicide committed with the lesser mens rea of gross negligence or an intent only to injure is involuntary manslaughter." *McMullan*

*v. Booker*, 761 F.3d 662, 668 (6th Cir. 2014) (citing *People v. Gillis*, 712 N.W.2d 419, 438 (Mich. 2006)).

Under Michigan law, manslaughter is a necessarily included lesser offense of murder. *See Gillis*, 712 N.W.2d at 437 (citing *Mendoza*, 664 N.W.2d at 694). "[W]hen a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Id.*

The Michigan Court of Appeals agreed with the trial court that no rational view of the evidence in Petitioner's case supported giving the manslaughter instruction:

> Manslaughter is, literally, "murder without malice," and the voluntary manslaughter defendant proposes here must be an intentional act of killing committed as a direct and immediate response to a "reasonable provocation" before the actor has had a reasonable opportunity to regain self-control. *People v Mendoza*, 468 Mich 527, 533-536; 664 NW2d 685 (2003). Such provocation is not an element of manslaughter, but rather a circumstance that can negate the existence of malice. *Id.* at 536. "[A] trial court's determination whether an instruction was applicable to the facts of the case is reviewed for an abuse of discretion." *People v Waclawski*, 286 Mich App 634, 675; 780 NW2d 321 (2009).

> This issue is complicated by defendant's obviously dubious attachment to reality evidenced by a number of statements he made at his police interview, including apparently having seen the victim alive the next day; discussing involvement in various military forces that proved unverifiable; the victim forcibly drugging him with a variety of improbable substances and selling him to other women multiple times over the course of their relationship; the victim having admitted to killing 30,001 people; and the victim making threats involving defendant's nonexistent son. On the day of the murder, defendant and the victim had sex, and according to defendant, at some point during that encounter, the victim maneuvered him into a position where she could have snapped his neck. Apparently, she also somewhat contemporaneously either threatened the aforementioned nonexistent

son or stated that she had killed him.  Defendant contended that he then jumped out of bed, hit her with his cane (which broke), and attempted to leave, at which point the victim threw a gumball machine at him.

Despite admitting that he suffered only a few scrapes, defendant then attacked the victim with the same gumball machine, breaking it in the process and causing her severe injuries.  As the victim was lying on the floor, defendant then put several strips of duct tape over her mouth, placed a trash bag that was still full of trash over her head, and secured it in place with more duct tape and a large lace doily.  It was then that he retrieved the pellet rifle, shot her multiple times, poured bleach on her, and then cleaned himself and his dog up and left the scene.

Taking defendant's contradictory and confused statements in the light most favorable to him, we cannot find reasonable provocation. Presuming, although not deciding, that whatever occurred while defendant and the victim were having sex could have been perceived as threatening, defendant conceded that any such threat had been terminated and, critically, he was leaving.   Notably, reasonable provocation is not the same as diminished capacity:  the trial court correctly observed that the reasonableness of a provocation is objective and based on "that which would cause a reasonable person to lose control."  *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998) (emphasis in original).  Defendant was unambiguously not under any serious imminent threat, and the evidence overwhelmingly shows that whatever other provocation might have occurred was mostly to completely delusional.  A defendant's delusions might, under the right circumstances and in the right case, be relevant to a claim of diminished capacity or insanity, but a defendant's unique mental state is not relevant to the determination of reasonable provocation for purposes of voluntary manslaughter.  *Id*. at 519-520.

The trial court properly refused to give defendant's requested voluntary manslaughter instruction.

(Mich. Ct. App. Op., ECF No. 7-12, PageID.897-898.)  The appellate court's analysis is patently reasonable and the factual determinations underlying the court's determination are well-supported by the record.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The Due Process Clause requires that every element of the charged crime be proven beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). When a jury is not properly instructed with regard to the elements of the charged crime, the due process right to proof beyond a reasonable doubt is implicated. *Sandstrom v. Montana*, 442 U.S. 510 (1979). As noted above, however, it is the prerogative of the state to define the elements of the crime and the federal courts are bound by their determination. *See Johnson*, 559 U.S. 133 at; *Jackson*, 443 U.S. at 324 n.16. It is also the prerogative of the state to determine what charge or charges to bring:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional

18

> violation" so long as "the selection was [not] deliberately
> based upon an unjustifiable standard such as race,
> religion, or other arbitrary classification." *Oyler v. Boles*,
> 368 U.S. 448, 456.

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (footnote omitted). Here, the
prosecutor did not proceed to trial on any charge other than first-degree premeditated
murder. That charging decision is not subject to examination by a federal court on
habeas review.

Similarly, the Due Process Clause guarantees criminal defendants a
meaningful opportunity to present a complete defense. *California v. Trombetta*, 467
U.S. 479, 485 (1984). Nonetheless, it is also the prerogative of the state to define
whether or not a defense applies to a particular crime. *See Foucha v. Louisiana*, 504
U.S. 71, 96 (1992) (acknowledging "the general rule that the definition of both crimes
and defenses is a matter of state law . . . ."); *Gimotty v. Elo*, 40 F. App'x 29, 32 (6th
Cir. 2002) ("States are free to define the elements of, and defenses to, crimes. . . . In
determining whether a petitioner was entitled to a defense under state law, federal
courts must defer to state-court interpretations of the state's laws . . . .").

In Petitioner's case, as the trial court explained, the absence of a voluntary
manslaughter instruction regarding adequate provocation did not deprive him of any
defense because "provocation is . . . a circumstance that can negate the existence of
malice." (Mich. Ct. App. Op., ECF No. 7-12, PageID.897.) Thus, "the absence of the
instruction did not preclude defendant from arguing that he should be acquitted
altogether on the theory that his real offense[, voluntary manslaughter,] was not

provided as an option." (*Id.*, PageID.898.)  Petitioner was free to argue that he was provoked and that the provocation precluded finding malice.  If he succeeded in convincing the jury of that, he could not have been convicted of first-degree or second-degree murder.

There are circumstances when failure to read a lesser-included offense instruction carries constitutional implications.  The Due Process Clause requires providing lesser-included-offense instructions in <u>capital</u> cases.  *Beck v. Alabama*, 447 U.S. 625 (1980).  Lesser-included-offense instructions were also required in noncapital cases under the English common law, and they are still required under the common law or by statute in every state and in the federal courts, if and when the evidence supports it.  *Id.* at 633-34, 636 n.11, 12.  Even though the courts of this nation are in complete accord as to the propriety of lesser-included-offense instructions, the Supreme Court has never held that lesser-included-offense instructions are required as a matter of constitutional due process in noncapital cases.  *Id.* at 638 n.14; *see also Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc) ("[The failure to instruct on lesser included offenses in noncapital cases [is not] such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]").

For all of these reasons, the appellate court's rejection of Petitioner's instructional error claim is neither contrary to, nor an unreasonable application of clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on that claim.

## V.    Judge-found facts

Petitioner argues that his sentence violated the Sixth Amendment because the Michigan sentencing guidelines were applied using facts found by a judge rather than a jury.  Petitioner bases his argument on the line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne v. United States*, 570 U.S. 99 (2013).  In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.   *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence.

In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding.  The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, and reiterated the rule that any fact that increased the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt."  *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court determined its conclusion with regard to the state sentencing guideline scheme in *Blakely* would also apply to the federal sentencing guidelines.  One group of five justices concluded that the federal sentencing guidelines ran afoul of the Sixth Amendment.  Another

group of five justices determined the appropriate remedy was to make the guidelines discretionary.

Subsequently, in *Alleyne v. United States*, 570 U.S. 99 (2013), the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences.

But, before Petitioner's trial, the Michigan Court of Appeals had already concluded that *Alleyne* only prohibited judicial factfinding used to determine a mandatory minimum sentence; it had no impact on judicial factfinding in scoring the sentencing guidelines producing a minimum range for an indeterminate sentence, the maximum of which is set by law. *See People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013). The Sixth Circuit also suggested that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violated the Sixth Amendment and, as a consequence, the question was not a matter of clearly established Supreme Court precedent. *Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013); *see also Saccoccia v. Farley*, 573 F. App'x 483, 485 (6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory statutory minimum [are] part of the substantive offense.' . . . It said nothing about guidelines sentencing factors . . . .").[1]

---

[1] The Sixth Circuit has since clarified that "Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences." *Robinson v. Woods*, 901 F.3d 710, 716 (6th Cir. 2018).

Before Petitioner was sentenced, the Michigan Supreme Court granted leave to appeal on an application that raised the *Alleyne* issue. *People v. Lockridge*, 846 N.W.2d 925 (Mich. 2014). When the Michigan Supreme Court issued its decision less than a year after Petitioner was sentenced, the court decided the *Herron* decision was wrong, reasoning that, because the "guidelines require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that mandatorily increase the floor of the guidelines minimum sentence range," they increase the "mandatory minimum" sentence under *Alleyne*. *People v. Lockridge*, 870 N.W.2d 502, 506 (Mich. 2015) (emphasis in original). As a consequence, the *Lockridge* court held that the mandatory application of Michigan's sentencing guidelines was unconstitutional. The Court's remedy, consistent with *Booker*, was to make the guidelines advisory only. *Id*. at 520-21.

The Michigan Supreme Court made its holding in *Lockridge* applicable to cases still "pending on direct review." *Id*. at 523. Petitioner's case was still pending on direct review at the time the *Lockridge* court reached its decision.

The *Lockridge* court identified a limited group of defendants that might demonstrate the potential for plain error sufficient to warrant a remand to the trial court: "defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure . . . ." *Id*. at 522 (footnote omitted). If a remand was appropriate, the supreme court called upon the

trial court, on remand, to determine if it "would have imposed a materially different sentence but for the unconstitutional restraint . . . ." *Id.* at 524.

It appears that Petitioner is one of the defendants who could demonstrate the potential for plain error such that his case should have been remanded for resentencing. The court of appeals, however, denied relief:

> [D]efendant argues that he is entitled to resentencing because his sentence was imposed before the Michigan Supreme Court found that the statutory sentencing guidelines were unconstitutional in *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). Defendant does not explicitly limit his claim of error to his CSC-I sentence, but implicitly must, because the mandatory life sentence to which he was contemporaneously sentenced for first-degree murder is not subject to the statutory sentencing guidelines. MCL 769.34(5). We therefore need not address this issue at all: the contemporaneous mandatory life sentence "effectively nullifies the significance of any sentences for the companion convictions." *People v Watkins*, 209 Mich App 1, 5; 530 NW2d 111 (1995). Because defendant cannot demonstrate that any error "affected the outcome of the lower court proceedings," *Lockridge*, 498 Mich at 393, it is unnecessary to consider whether there was in fact any error.

(Mich. Ct. App. Op., ECF No. 7-12, PageID.898.)

The issue in this Court is not whether Petitioner's CSC-I sentence complied with *Lockridge*; but, rather, whether it complied with *Alleyne*. But, even if Petitioner's CSC-I sentence did not comply with *Alleyne*, this Court could not provide any meaningful relief. For that reason, I recommend that the Court decline to consider Petitioner's challenge to his CSC-I sentence under the concurrent sentencing doctrine.

The "concurrent sentencing doctrine" invests the court with discretion to decline to hear a substantive challenge to a conviction when the sentence the petitioner is serving on the challenged conviction is concurrent with an equal or

longer sentence on a valid conviction. *See United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992); *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989). The doctrine has its origins in appellate practice applicable to direct review of criminal cases. *See Benton v. Maryland*, 395 U.S. 784, 788-91 (1969); *Hirabayashi v. United States*, 320 U.S. 81 (1943). In these cases, the Supreme Court and the Sixth Circuit have declined to review convictions on one count where the presence of a valid concurrent count is sufficient to retain the defendant in custody. *See, e.g., Hirabayashi*, 320 U.S. at 105; *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976). The standard guiding the court's discretion is whether there is any possibility of an adverse "collateral consequence" if the conviction is allowed to stand. *See Hughes*, 964 F.2d at 541; *Dale*, 878 F.2d at 935 n.3; *see also United States v. Byrd*, No. 89-6448, 1990 WL 116538, at *3 (6th Cir. Aug. 13, 1990); *United States v. Jackson*, No. 99-5889, 2000 WL 1290360, at *2 (6th Cir. Sept. 7, 2000); *United States v. Bell*, No. 95-6479, 1997 WL 63150, at *3 (6th Cir. Feb. 12, 1997).

Although the doctrine has its roots in direct appeals, the federal courts apply it in habeas corpus actions, citing the futility of reviewing a conviction that will not result in a petitioner's release from custody. *See, e.g., Cranmer v. Chapleau*, No. 95-6508, 1996 WL 465025 (6th Cir. Aug. 13, 1996); *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991); *Williams v. Maggio*, 714 F.2d 554 (5th Cir. 1983); *VanGeldern v. Field*, 498 F.2d 400, 403 (9th Cir. 1974). The exercise of the court's discretion depends upon the degree of prejudice that may be attributed to the challenged conviction and, specifically, the effect of any adverse collateral consequence if the conviction is

allowed to stand.  *Williams*, 714 F.2d at 555.  "'[A]dverse collateral consequences' such as 'delay of eligibility for parole, a harsher sentence under a recidivist statute for any future offense, credibility impeachment, and societal stigma[,]'" may be considered.  *Buffin v. United States*, 513 F. App'x 441, 448 (6th Cir. 2013).  In *Pillette v. Berghuis*, 408 F. App'x 873, 886 n.8 (6th Cir. 2010), the Sixth Circuit also included "an effect on . . . a potential pardon" and "the potential for use as evidence of a prior bad act" as additional adverse consequences.  *Id.*

Such remote consequences, however, "are most salient on direct appeal, not on a collateral challenge."  *Buffin,* 513 F. App'x at 448.  The *Buffin* court pulled the list of collateral consequences from *United States v. DiCarlo*, 434 F.3d 447, 457 (6th Cir. 2006).  The *DiCarlo* court, in turn, quoted the list from *Rutledge v. United States*, 517 U.S. 292, 301-02 (1996).   The *Rutledge* Court derived the list of collateral consequences from *Benton v. Maryland*, 395 U.S. 784, 790-91 (1969), and *Sibron v. New York*, 392 U.S. 40, 54-56 (1968).  *DiCarlo*, *Rutledge*, *Benton* and *Sibron* were direct appeals.  Moreover, *Benton* and *Sibron* considered the existence of collateral consequences because absent such a consequence there would have been no justiciable controversy in those cases.  The *Benton* Court noted that the fact that it could conceive of collateral consequences that might give rise to a justiciable controversy and permit the court to exercise jurisdiction did not deprive the concurrent sentencing doctrine of validity as a rule of judicial convenience.  *Benton*, 395 U.S. at 791.  The *Benton* Court simply chose to not apply it in that case.  *Id.* at 792.  *Rutledge* and *DiCarlo* (and the other cases cited in *DiCarlo*) are all double

jeopardy cases where the existence of collateral consequences, no matter how slight, creates the multiple punishments barred by the Double Jeopardy Clause. Such slight or remote collateral consequences should not preclude application of the concurrent sentencing doctrine when jurisdictional and double jeopardy considerations are not at issue. If they did, the doctrine would simply disappear.

The present case is appropriate for application of the concurrent sentencing doctrine. Petitioner is serving a sentence of life without parole for first-degree murder. Petitioner is also serving concurrently a sentence for CSC-I of 225 months to forty years. His *Alleyne* challenge relates only to his CSC-I sentence because his first-degree murder sentence is the product of a statutory mandatory sentence.[2] Thus, even if the court were to conclude that Petitioner's CSC-I sentence violated his Sixth Amendment rights under *Alleyne*, the remedy would be a remand for resentencing that, no matter how it was resolved, would not change the duration of his confinement for even one day.

Moreover, the sorts of collateral consequences that counsel against application of the doctrine are simply not at issue in Petitioner's case. Petitioner's challenge, if successful, would impact only his concurrent sentence, not his conviction. He would remain at exactly the same position for purposes of Michigan's habitual offender sentencing scheme. He would remain guilty of CSC-I and murder so any change in

---

[2] *See* Mich. Comp. Laws § 750.316. Petitioner's sentence for first-degree murder, therefore, does not depend on judge-found facts at all; instead, his sentence necessarily follows from the jury-found fact that Petitioner was guilty of first-degree murder.

his concurrent sentence would hardly be of significance in the eyes of a subsequent pardoning authority.   Further, the stigma associated with Petitioner's criminal history would not be reduced at all.

If the concurrent sentencing doctrine retains any vitality—and the Supreme Court and the Sixth Circuit Court of Appeals indicate that it does—this is a case where it should be applied.   And, applying the doctrine to decline to consider this issue has no meaningful impact on Petitioner.   Accordingly, I recommend that the Court exercise its discretion and decline to consider this claim.

## VI.    Gruesome photos

Petitioner next contends that his trial was rendered unfair, and his due process rights violated, by the prosecution's introduction of gruesome autopsy photographs. The court of appeals disagreed:

> In his Standard 4 brief, defendant contends that the trial court erred by admitting a series of graphic photographs from Neumann's autopsy because they were unfairly prejudicial and unnecessary to the prosecution's case.  We disagree.
>
> Defendant does not suggest that the autopsy photographs were irrelevant under MRE 401, nor would any such assertion have been reasonable.  The autopsy photographs depicted the nature and extent of the victim's injuries, which made defendant's premeditation and deliberation more probable than it would have been without the evidence.  See *People v Gonzalez*, 468 Mich 636, 641-642; 664 NW2d 159 (2003) (stating that manual strangulation may evidence elapsed time between initial homicidal thought and ultimate action for purposes of establishing first-degree premeditated murder).  The photographs were also helpful in corroborating the testimony about the lengthy process employed by defendant to kill the victim, and to illustrate the medical testimony provided.  Their relevance and probative value were not trivial.

Conversely, it is not seriously disputable that the photographs were disturbingly graphic. The victim's injuries were severe and her body had been decomposing for approximately a week before the autopsy took place. As a result of the decomposition process and the caustic nature of the bleach that was poured on her, many areas of skin were discolored and there was significant sloughing of the skin visible in the photographs. Numerous injuries, ranging from pellet wounds to lacerations to bruising and lividity. Even the prosecution characterized the photographs as "bloody, brutal, [and] graphic." In fact, during the presentation of the autopsy photographs, one juror lost consciousness. However, there is no direct indication that the photographs were the cause of the juror's infirmity, and the trial court, prosecution, and defense counsel all agreed that the incident involving the juror did not affect the manner in which the trial proceeded and would be unlikely to influence the remaining jurors' ability to continue with the case.

Even relevant evidence may be excluded at the trial court's discretion " 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *People v Blackston*, 481 Mich 451, 461; 751 NW2d 408 (2008), quoting MRE 403. Photographic evidence need not be excluded merely because it is gruesome or because a witness could orally describe what a photograph depicts. *People v Mills*, 450 Mich 61, 76-78; 537 NW2d 909 (1995). There is no indication that the photographs here were intended for an improper purpose, and although we appreciate that the photographs were disturbing and thus had some potential for unfair prejudice, we are simply not persuaded that the danger of unfair prejudice substantially outweighed their probative value. In any event, we believe the issue to be a close one, and there is generally no abuse of discretion when the trial court's decision involves a close evidentiary question, *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000). We do not find the photographs to have been improperly admitted.

(Mich. Ct. App. Op., ECF No. 7-12, PageID.898-899.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle,* 502 U.S. at 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state

conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Petitioner was not denied a fundamentally fair trial by the admission of photographs of the victim's injuries. Without a doubt, the photographs were gruesome, but the court of appeals identified multiple reasons why the photographs were relevant and probative. The Sixth Circuit has found no due process violation in such extreme cases involving photographs of murder victims when there is a legitimate reason for demonstrating the nature of the injuries. *See, e.g. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding that admission of photographs depicting murder victim's severed head, her severed head held near her torso and severed breast, and her torso with her severed head and severed breast replaced on torso, did not deprive defendant of fair trial, and thus did not warrant federal habeas relief); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the

testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that, "although the photographs were gruesome, they were highly probative").

The photographs were relevant to illustrating trial testimony regarding the victim's injuries. The nature of the victim's injuries was particularly relevant in this case in light of the defense theory that the attack was provoked. Moreover, the photographs in this case were no more inflammatory than in *Biros*, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso. *See Biros*, 422 F.2d at 391. Accordingly, Petitioner cannot establish a due process violation arising from admission of the photographs.

Petitioner has failed to show that the court of appeals rejection of his due process claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief on this claim.

## VII.  Ineffective assistance of counsel

Finally, Petitioner contends that his counsel rendered ineffective assistance because counsel failed to raise an insanity defense. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of

prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals considered Petitioner's ineffective assistance of counsel claim consistently with the *Strickland* standard. The court concluded that counsel's decision to forego the defense was not objectively unreasonable and that there was no reasonable probability the defense would have succeeded, thus there was no prejudice:

> Pursuant to MCL 768.21a(1), a defendant facing criminal charges may assert legal insanity as an affirmative defense. *People v Carpenter*, 464 Mich 223, 230-231; 627 NW2d 276 (2001). Legal insanity requires a defendant to "lack[] substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law" because of a "mental illness." MCL 768.21a(1). "Mental illness" is defined as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400(g). A defendant asserting legal insanity as a defense has the burden of proving the defense by a preponderance of the evidence. MCL 768.21a(3); *Carpenter*, 464 Mich at 231.
>
> Clearly, defendant was suffering from a mental illness; his bizarre tangents and statements during his police interview can lead to no other conclusion. It is apparently not disputed that trial counsel was aware that defendant had an extensive history of mental illness including delusions and hallucinations. However, mental illness is merely a prerequisite to an insanity defense. Defendant's statements also make it clear that he was well aware of what he was doing; at most, he was deluded about why. A psychological evaluation was conducted that concluded that defendant was not legally insane at the time of the crimes. The psychologist acknowledged that some of defendant's statements, if taken at face value, cast some doubt on his capacity to appreciate the nature and quality or wrongfulness of his actions, or otherwise to conform his conduct to the requirements of the law. However, defendant's varying accounts demonstrated that he was an unreliable informant, and the psychologist's observation of defendant and review of various records revealed that defendant had a history of

33

manipulation and deceitfulness which suggested that his exculpatory statements may have been consciously designed to avoid prosecution.

Consequently, it does not appear that defense counsel's decision to forgo an insanity defense was objectively unreasonable.  See *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000) (stating that "[t]rial counsel is not required to advocate a meritless position").  Had defense counsel nevertheless asserted an insanity defense at trial, it seems certain that the prosecution would have responded by relying on the psychologist's opinion that defendant was legally sane at the time of the offense.  Because defendant's unsupported theory would have been rebutted by a contrary expert opinion, and as noted his own statements were at best equivocally supportive of possible insanity, it is not reasonably probable that the outcome of the trial would have been different had defense counsel advanced an insanity defense.  We decline to consider defendant's request, in his supplemental Standard 4 brief, for us to expand the record on appeal to consider additional medical records.  MCR 7.219(A)(1); *People v Williams*, 241 Mich App 519, 524 n 1; 616 NW2d 710 (2000).  Defendant's supplemental Standard 4 brief appears, in any event, to conflate mental illness, even severe mental illness, with legal insanity.  We are not persuaded that there is any reasonable probability that an insanity defense would have been successful if it had been attempted.

(Mich. Ct. App. Op., ECF No. 7-12, PageID.899-900.)

The appellate court's application of *Strickland* was reasonable.  The court's recognition that Petitioner conflates mental illness with legal insanity is certainly accurate.  Petitioner presents pages and pages of medical records that support his claim that he is mentally ill.  Mental illness may be a necessary element of legal insanity, but it is not sufficient.  Petitioner simply ignores the requirement to show that "as a result of mental illness . . . [he] lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his . . . conduct or to conform his . . . conduct to the requirements of the law."  Mich. Comp. Laws § 768.21a.  The only evidence on that issue was the report of the Dr. Ellen Garver.  She opined that

Petitioner was not legally insane.  (Report, ECF No. 7-12, PageID.979.)[3]  Therefore, the appellate court's determination regarding the objective reasonableness of counsel's decision to forego the insanity defense is well-supported in the record.  It certainly serves as a  "reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105.  That reasonable argument ends the ineffective assistance analysis.

Petitioner has failed to show that the court of appeals rejection of his ineffective assistance claim is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v.*

---

[3] Moreover, although not directly relevant to the legal insanity defense, Petitioner was examined by Dr. Garver again and by an independent expert to determine whether Petitioner could have knowingly and intelligently waived his *Miranda* rights.  (June 14, 2016 Hr'g Tr., ECF No. 7-11, PageID.889-890.)  Both experts concluded that Petitioner was competent to waive *Miranda* rights.

*McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Respectfully submitted,

Date: April 13, 2020                    /s/ Phillip J. Green
                                        PHILLIP J. GREEN
                                        United States Magistrate Judge

## NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).